Good morning. Good morning, Your Honors. My name is Laura Wolfe, representing the State of Alaska, the Department of Fish and Game. To understand ANILCA, it's important to start at statehood. Gaining authority to manage its fisheries and wildlife was a centerpiece of Alaska's push for statehood. In 1959, the state became the primary manager of fishing and hunting throughout all Alaska, including on federal public lands. And when Congress enacted ANILCA, a mere two decades later, it was well aware of the state's critical role and proven performance in managing fish and wildlife for its people. And today, because of the state's active management of its wildlife to promote the sustained yield, to promote the opportunity to hunt for both subsistence and non-subsistence, because of the state's active management, there are now unparalleled opportunities to hunt and fish in the state. This appeal is not really about rural versus non-rural use. It's about the state's historic police powers versus the Federal Subsistence Board's authority. Through Title VIII of ANILCA, Congress gave the Secretary's authority to effectuate a priority for rural subsistence hunters, but it limited that authority. Isn't this whole thing moot? I mean, it's all done. It can't be replicated. Do you think this can be replicated? Yes. So I think there's actually two, there are really two separate issues. There's the K-Cunt and there's the Unit 13 closure. The mootness analysis for each, we think the exception applies, but it's a different analysis for each. So I think when this court does analyze them, they should analyze them separately. For the K-Cunt, the board has in the past, it continues to open emergency hunt through its special action regulation. But the state isn't contesting that opening for this specific hunt is moot, right? You're talking about the broader statutory authority question? Yes. But on this hunt, that's moot because it's done, it's over with. So this hunt, yes, it is moot. However, these special actions, they occur for, you know, 30 days or 60 days, and they're usually in different places. They're special actions. They don't occur that frequently, but they do occur. And they're so short-lived that unless an exception applies, the state is never going to be able to do that. Can I follow up on Judge Nguyen's questions? Because you had multiple challenges in the district court, but you're not challenging the K-Cunt, you're agreeing that's moot, and you're not challenging the delegation of authority to local park managers. That's not being challenged. So the only thing left is whether the FSB has the authority to authorize these emergency hunts. Is that right? So there's two separate, we are challenging the K-Cunt. We're not challenging factual discrepancies about the K-Cunt. But you just said that's moot in response to Judge Nguyen's question. We think the exception applies. It's capable of repetition, yet evading review. So we think that is, okay, now I'm confused. Okay. Because I thought I had the answer to my question, and so let me go back and see if I can cover the same ground again to make sure I understand the state's argument. This particular K-Cunt is done, right? So the state is not contesting that. What you're saying is that the capable of repetition, yet evading review piece of it is the challenge to the statutory authority to take these sort of special actions altogether. Correct. Right. Yes. Okay. That's how I understood it, but then you went back on the mootness as to the specific K-Cunt here. So that's what threw me off. Well, the way to challenge the specific authority is through the application, right? So we're not challenging the regulation, for instance, when it was enacted. We are challenging the application of the regulation. That's why we have six years from the application of that regulation to challenge that. But we're of hunts when the state has closed a hunt. Wait. So you are challenging its application to the K-Cunt? So it's not really... I mean, the reason why we're challenged... So we're within the... So you're doing an as-applied challenge? Yes. Well, it's an as-applied... We're not... As-applied to the K-Cunt. I mean, it is as-applied to the K-Cunt. That's what gets us into court. That's what gives us standing. But our theory, our argument, is a little broader than that. It's not a facial challenge to the regulation completely, although we could make a facial challenge, but we're not because we think that the regulation actually can be applied within the contours of ANOCA. But we think this application that the federal government took with regards to the K-Cunt, that the federal government took in, you know, to Looksook in 2018, that the federal just took last Tuesday when it issued another opener for a hunt on the Kuskokwim around there, that those sorts of actions are beyond the authority that Congress granted in ANOCA. And just going back to mootness, again, there's two separate reasons for... Well, we think the same... So you're challenging an action that the FSB just took recently? We're not challenging an action that FSB just took recently. I'm just making the point that they just took recently to show that this is capable of repetition, that it's capable of repetition that they just open a hunting season that the state has closed. That is the action that's capable. It's not the same exact action. It doesn't have to happen in CAIC during the COVID pandemic for reasons of food security. Okay, so we agree with you that the challenge to the authority to open hunts on the special action sort of basis is capable of repetition, yet evading review. Do we send it back to the district court for analysis in the first instance? This court has two options. This court could do that, or under Planned Parenthood, the case that I cited in my brief, this court could actually just review it right now. The issues are briefed. It's a purely legal issue, doesn't require, you know, any other fact findings, so this court could send it back for the district court to review first, or this court, you know, can alternatively choose to review the issue right now. But in issues of first impressions, sometimes it's very helpful to have the district court's analysis in the first instance. I mean, sometimes it's a pure issue of law, so this court would be reviewing it de novo on appeal, but if this court wants another court to look at it, I guess, and to review de novo, it's certainly within this court's discretion. I'm still confused. You're not challenging the regulation that authorizes the opening of hunts under this emergency hunt provision? We are challenging the application of the regulation, yes. This regulation is broader than just opening. The regulation also allows emergency closures. We're not challenging that. We think the federal subsistence board has authority to make emergency closures for certain reasons. We're not completely challenging the regulation in all of its aspects. We are challenging one aspect of how the federal subsistence board applies this regulation. It did so in CAIC in this way. It's done so in the past in this way. It's recently done so on Tuesday in this way. That's why it's capable of repetition. And you're not challenging the delegation to local park managers? Correct. Okay. Just that they can't open it in this way? Correct. Now, as I said, there's two separate issues on mootness. That's one of them. The other one has to do with the Unit 13 closure. And that is much more particular to the Unit 13 closure. But it also has, you know, some broader implications just in closures in general throughout the state. And I can ask you, I have a number of questions on Unit 13. Sure. Um, would it matter if in a future action, the request was to close all of 13? Or does it meet the second element of capable of repetition yet evading review if it's just a request to close 13 A and B? Or does it matter if it's a request to close 13 A and B and one or more of the other subunits within Unit 13? So I think that would be the same capable repetition. I think that would meet the second prong of the mootness analysis. If your question is going to the second prong. Information is different when you're seeking a request to close all of Unit 13 versus just A and B or A and B and D or A and B and C. So I think that our analysis on the merits, not on the mootness, but on the merits of why the Unit 13 closure, federal lands in Unit 13, is actually not meaningfully different from federal lands in Unit 13 A and 13 B can help assist in answering that question that there really is not much difference there. So. You'd have to prove arbitrary and capricious for the closure. Is that right? Yes. What was so arbitrary and capricious about closing that? In Unit 13? Okay, so turning to the merits of Unit 13. So the first, I think if we're just looking as a legal matter what Congress meant when it said necessary for subsistence use, Congress found in Section 3111 that necessity could arise when increasing population in Alaska put quote results in pressure on subsistence resources. Necessary we don't think can possibly mean, just as a legal matter it would be unlawful for it to mean restricting non-rural hunting when the undisputed record shows that there's actually a surplus of caribou and that the habitat can't actually sustain that many caribou. So you have to have more hunting. So the state can't come in and say, oh actually we think closure is necessary even though there's a surplus of a resource. We think that is arbitrary and capricious right there. Also data that supports the FSB's decision. Can you address that? There's some data that supports the board. Right, the closure, right? Because there was a decrease in the success rates. So that's actually just a misunderstanding I think of the data and that was, it's not a discrepancy between success rates of users, it's a discrepancy of the permit holders. So federally qualified subsistence users, they hunt on federal land, they also hunt on state land. Federal land isn't a cage. So they will get, not always, but most users get a permit, a federal permit, and they get a state permit. And they go out and hunt and if they get something on federal land and they might say, hey we got a success under a federal permit, they might say, hey we got a success under a state permit. If they walk a couple meters more onto state land and they get an animal on state land, they're still a federal qualified user, excuse me, but they report success under state land. So that's the success under the two permitting systems. It depends where, it really depends where they get that animal and there's just way more state land and then way more success on state land. So I think it's just a very misunderstanding. There's a misunderstanding of what that data meant. But if there's a misunderstanding and they base it on something, on the data, then how is that So if someone says, well we think, if the rule is you can close when something's red and the data actually shows that it's green but they thought that it was red, well no, that's still arbitrary. It's just wrong. It's a misunderstanding. Like it was an innocent misunderstanding. We're not saying that it was malicious. It was just, it was based on a misinterpretation. If they base it on something, on a data analysis, and even if that data analysis is wrong, based on somebody else's data analysis, what's the best case that says that? So I'm not saying there's two different sets of data and there's a competition between data. There's one set of data. They just misunderstood what it meant. So it's arbitrary and capricious I mean, I think any case that says, I based my analysis off of thinking that this color was red but it was actually green. Arbitrary and capricious doesn't shield innocent misinterpretations. If it's a misinterpretation, it's a misinterpretation. It's not two different data sets. It's just completely missing the ball of what that meant. Could we go back to the mootness exception? Because I actually don't think it applies here. If I look at ninth circuit law, Greenpeace says, if it's the same biological opinion in the next agency action, then the exception applies. But if you look at Idaho and Ramsey and even native village of Nisquick, they say, if it's a different biological opinion, then the exception does not apply. And if there is a future request to close 13 A and B, you're going to have at least two years, I mean, depending on when the request is made, of additional public safety information. You're going to have two years of additional information on where the caribou and the moose are moving, where they're traveling, are they near the freeway, the roadway, the freeway, the roadway, what the comparative success rate is between federally qualified subsistence users and federally qualified users. You're going to have more population data on caribou, on moose, birth, death, adults, calves. You're going to have more numbers of permits issued and used. You're going to have more common subsistence hunt community data, the number of groups, the number of households, the number of individuals. You're going to have more harvest quota and harvest data, federal, state, accident, unreported, illegal. You might have information on weather events that are affecting populations of moose and caribou. You're going to have weather event information about preventing user access to various locations. I guess from my perspective, I don't see how a future decision to close this is not going to be based on different facts and require a different weighing than what happened in 2020 or even 2019. I mean, in these environmental cases, so much depends on what is the current state of the population that you're trying to manage these populations. And so additional data actually makes a big difference and it's a different case. It's a new case next time when there's all this new information that the FSB will have to consider. So I'd like to hear why you think that you can that reasonable expectation that the plaintiffs will be subjected to the challenge action again. When the OSM report is going to be different, it's going to have more data. The interagency staff reviewing that OSM report might make a different recommendation on different bases, might weigh the factors differently, might use different criteria, different factors. There'll be public on safety and success rates and, you know, perhaps the migration of the caribou and moose. And then the FSB is going to have to consider and weigh all that new data. So I just don't understand why that's not a new and separate action. So first, just to discuss very briefly the cases you talked about, I think that this court should be very careful when trying to import case law from NEPA and mootness under NEPA, which is kind specific to procedural errors and when you actually are considering something rather than substantive review under an APA, whether something is arbitrary and capricious for different reasons that keep arising again. I think that's just a different analysis. So I would just ask the court to pause there for a moment and think about that. And then second, these are longstanding issues. There's testimony saying, actually the migration is the same. It's been the same. Movement changes, but migration is the same. Yes, there's different weather reports from one year to the next that's, you know, taken into account. I'm not saying that's going to be exactly the same, but it's going to be close enough. And you can look even at the board's own decision when it was considering a one-year. So give me a case that identifies and defines what is close enough. I haven't been able to find one that says clearly what is close enough. I mean, give me other cases. If you don't want us to look at Idaho or Ramsey or Greenpeace, give me one that says what is close enough, because in these environmental cases, the slice in time really matters. The data at that point in time really matters. And so I just don't think it's the same action again. I think a future request will be based on different facts, different criteria, different factors. So I think that to answer to that, and I see my time is running out. I'm hoping to have a little bit of rebuttal time, but I do want to answer a question. First, I think the case that we cited from the Supreme Court saying it doesn't have to be every single thing doesn't have to be exactly the same. Are you referring to Bellotta? I don't think Bellotta is on point at all. Okay. Second, other than Bellotta. Bellotta was people who wanted to do this tax issue, and it was going to be a state initiative, and they wanted to contribute to that. I don't think Bellotta is at all on point. So what do you have other than both? It's not an environmental case, but I think it talks about the exception. And just if you try to get every little detail the exact same way, this exception will just not apply ever. Second- You're saying don't even look at NEPA because that's on point. Are you telling me this tax issue that's all about tax threat of prosecution in criminal cases, that that would be more on the NEPA side? I think it's just that in order to have the exception be meaningful, you can look at whether there's been long-standing action, whether the board, for instance, said, hey, somebody proposed one year, but we're going to actually extend this to two years because this issue keeps arising, because people keep asking for the same thing, because this is a long- I know you're totally running out of time, but I'll give you a little bit of time for rebuttal. Thank you. If you can respond to just two quick questions I have. There are two grounds that the FCB relied on foreclosure. One is the necessary continuance for subsistence users, and the other one safety, public safety concerns. If we are persuaded by one and not the other, is that a problem? In other words, the independent grounds, or do we need to address both? I think they are independent grounds. One just point I'd like to make with public safety is something we didn't argue below, so I just didn't feel like it was appropriate to argue on appeal, is exactly the legal understanding of when public safety is supposed to arise. If you look at section 3126, it says that when you're restricting subsistence users, obviously the secretaries can restrict for public safety, so if there is a campground, or if BLM gives land to some people for a period of time because there's a festival, sure, you can restrict subsistence uses, and then it's incorporated into 3125 because obviously you're going to be restricting for both, for hunting, for non-subsistence uses too, so I think what Congress meant for public safety is it's not safe to have hunting here, period. I don't think that we argue that below, so I don't think this court really should address it, so if this court does issue a decision on public safety, we'd much prefer just saying, like, assuming public safety means this. Okay, I got it, I got it. My other quick question for you is, I know that there's a dispute over the significance of the data, you know, I think FSB was aware of the limitations of the data, but setting that aside, the ground for subsistence uses was also buttressed by the community's expressed concerns, kind of the user experience concerns that non-locals are out-competing the local hunters, and there's also a reliance on the fact that hunters are avoiding that particular area because of safety concerns, so that's some, you know, I don't know if your response is going to be questioning the significance of that, but we have that in conjunction with data, so how do you respond to that? So first, I would just say, instead of saying in conjunction with data, because I think the data just doesn't support it at all, just say, let's just say we have just the anecdotal evidence, and maybe that's enough. Multiple reasons cited. Okay. I'm not attaching any significance to that, it's just a shorthand way of saying they cited multiple reasons, and so setting aside the potential weaknesses of the data, what do you do with the other grounds? So I think as just a legal matter, opting out, it doesn't mean something is necessary, because everyone wants to hunt with less competition. And again, the federal land here, it's not a cage. People can go and hunt in state land as well. That's one reason. When people say, well, there's enough animals, we could go hunt, but we just don't like it. We don't want to hunt with other people. That doesn't make it necessary. And one of the reasons I would say that is the text of the statute. If you look at section 3113, and what ANILCA protects, it protects uses. Uses for food, uses for clothing, handicrafts, all different types of uses. Right. No, I understand. You're advocating advancing a pretty narrow interpretation of what constitutes necessary, but I get your argument. I want to see if Judge Boo has any additional questions, and then I want to hear from the FSB folks. Is it to Judge Koh's question about... Why don't you do it on rebuttal? I'll do it on rebuttal time. I'll put three minutes on the clock when you stand up again. Thank you. You can think about the additional cases that you want to cite for our consideration. Good morning. Good morning, and may it please the Court. I'm Kevin McCardle on behalf of the Federal Subsistence Board, and with the Court's permission, I'll start with the question of before turning to the merits. The first challenge action is the Board's authorization to the organized village of Cake, a federally recognized Indian tribe, to conduct an emergency subsistence hunt on federal land. That 60-day authorization expired in August 2020, now nearly two and a half years ago. I think it's important to underscore that the authorization was modest. The hunt lasted 30 days. It resulted in the harvest of two bull moose and five male black-tailed deer exclusively from federal land in one game management unit. Didn't cause any conservation concerns for the affected populations. There's no allegation that it prevented Alaska from achieving its wildlife management objectives. But even if Alaska did suffer some at this point... Do you think it's going to happen again, though? That action will not happen again. Never are they going to open it up based upon anything that happens ever again? Well, there was a discussion in the prior presentation. This isn't a challenge, a facial challenge, to the regulation itself, because that would be time barred. That was spelled out in the briefing. Alaska clarified that they're challenging this specific application. That type of application is not going to happen again. It was driven by the extraordinary circumstances of the pandemic that no longer exist. It was processed under a special administrative delegation of... Well, that's how the district court characterized it, as a special action as a result of the pandemic. But as I understand it, the state's argument is broader than that. They're challenging the very statutory authority to take these sort of special actions. And the regulation is still on the books, right? And there's going to be other requests. There were 11 just in 2020 alone. So why doesn't that fit within the capable of repetition, yet evading review exception? The question of statutory authority to take these sort of actions. If that's the lens that we're going to look at this under, the question of statutory authority, the issue isn't capable of repetition, because the board opens seasons or has special open seasons for subsistence hunters routinely. But the problem is, it will evade review. That's the difference. The specific application that's being challenged, this COVID-related emergency subsistence hunt, that's not going to occur again, because the circumstances on the ground have changed. This legal issue that Alaska says will recur, that will definitely recur, because there are regulations on the books now that... Would you rather us to say, okay, it's capable of review, and how you did it was just fine. And then you could go off and have an opinion that says, we did it. The Ninth Circuit said we follow the rules. Well, that would provide... If I understood the question correctly, I think that would be a practical benefit for us. But the controversies move. I mean, if there's no Article 3 controversy, we have a duty to point out that to the court. And that's definitely the case here, with this extraordinary authorization that was driven by an unprecedented pandemic. That type of application is not going to happen again. Now, if the... Climate change. Let's say climate change happens, and there's warms up, and the caribou is not going to have as much grass to eat. It's capable of repeating itself, isn't it? Well, in some way, not without COVID, but with some other way. Yes. It's certainly possible that the board could open a subsistence hunt in an entirely different area for entirely different reasons, like the example Alaska provided in its brief from 2018. That was a situation, if I remember correctly, where there was a blackout, the electric went out, and all the food in a rural community spoiled. So there was a 14-day subsistence hunt authorized by the board to address that. That's a completely different action. That's not the same... They're always short-term, regardless of whether it's due to an outage or pandemic-related. So how does the state ever get this issue of whether there's statutory authority to take special actions before the court for review, if you're saying that you don't... You have to look at whether it's pandemic-related, due to electrical, due to weather condition, Because if you distill it down and take all the facts out, like Alaska did for purposes of this appeal to avoid mootness, what you're left with is a legal issue that will not evade review. It's this legal issue, does the board have authority to open hunts? That's not tied to emergency short-term actions. That's an inherent part of the board's subsistence management regulations that have been in place since 1990. I mean, Section 100.25b of the regulation states, subsistence hunting on federal lands is closed unless open by federal regulations. And we cite an example in our brief where we opened moose hunting, I think it was, for a 30-day advanced season in order to implement the subsistence priority. And that's been on the books for 25 years. So remember, capable of repetition is an extraordinary exceptional exception, or it only applies in exceptional cases. And that it doesn't fit the bill here because the legal issue, if we were looking at this in terms of the legal issue that Alaska wants to press, that will not, quote, forever evade review, unquote, as required by the Lewis case. Can I ask a question? The district court noted that the FSB suspended consideration of 10 emergency hunts while the lawsuit was pending. And I know the district court actually denied an injunction. Is FSB sort of imposing a self-imposed injunction by not ruling on these requests while the lawsuit is pending? How long was that suspension? Is it still in effect now? And I guess I'm asking because you asked us to remand. And if we remand, is that just going to prolong the suspension of any consideration of any emergency hunt requests? Well, Your Honor, I have to admit, I hadn't noticed the term suspension before. And I knew there were other emergency requests provided under this administrative framework that were pandemic-driven to address food insecurity. And all I know about those is that none of them were denials. Is that right? That's my understanding. I don't think it was suspension. And also, remember, the administrative frameworks, the delegations of authority, they've all expired, too. So this whole context doesn't exist anymore in which this challenged authorization took place. And then if you distill it down to the legal issue, like I said, that's not going to forever evade review because the board, at least occasionally, establishes advanced open seasons exclusively for subsistence hunters as part of its general non-emergency regulations. But they have to wait for the next case, is what you're saying? Well, they could bring one now. They could challenge that example if they have standing, and assuming it's not time-barred and whatever other judiciability problems might arise. But if they want to press that theory, there's a regulation on the books where we've opened federal land to subsistence hunting. If they don't think we have that authority, they can challenge that regulation. And we'll raise every defense that we have, but, you know, it's not moot if it's still on the books. Would you address the mootness issue with regard to Unit 13, please? Yes. I don't think I could do, I know I can't do a better job than Your Honor did in listing all of the different circumstances that would come into play in a future decision, except I would highlight one. You know, whether the board will consider another closure in the Unit 13 is itself speculative. But if it did, as it noted in its procedures in S.E.R. 6, it considers each request on its own merit and in light of the particular circumstances at that time. And we outlined the different analyses that would come into play in the board's evaluation of a future closure. But also, what I want to highlight is the board, of course, would have to take into account what were the effects of this two-year closure. And it seems to me, it seems almost self-evident, that that would be a critical new factor that would likely be determinative in the board's considerations. And that factor alone would render any new analysis that the board did in support of a hypothetical future closure completely different. Would there be any other bases of authority to do a closure other than what was used for the 2020 closure? Yes, at least one for conservation purposes. But would you be relying on the same regulation? Yes. If it was a temporary closure, we'd be relying on 50 CFR 100.19. Can I ask you about the cited basis for closure to continue subsistence uses? There are significant limitations to the data that's argued by the State of Alaska. How do you respond to that? Well, the first thing I would note is something Your Honor alluded to at the end of the prior presentation. And that's, it wasn't just the data, it was the testimony of local subsistence users. And I don't want, I think it's important to emphasize, that's a critical factor. It's built into the statute in section 311, parenthesis 5, I believe, that, you know, the statute was constructed to allow local subsistence users to have, to participate in board decision making. And that's why the board, when it has one of these proposals, has public hearings. So the testimony is of critical importance and it all supported the board's decision. And... Right, no, I understand that, you know, there is a record here and we look at it holistically to determine arbitrary and capriciousness. But you have community expressing concerns that there's severe competition and I guess the locals feel squeezed out. But that's backed up by specific data that has, according to the state, severe limitations. Well, the limitations that the state identified are the same limitations that the board identified, or the board was aware of, because OSM, the Office of Subsistence Management, identified them in its analysis and in its presentations to the board. And I think, so what you have, what the board had, is it had this local ecological knowledge, this local testimony, and the data, despite its limitations, was consistent with the testimony. It did show lower success rates. Now, that data is qualified, but it's consistent with the testimony. And under any interpretation, that's a rational basis for the board's decision to impose the closure. You know, Alaska says the substantial evidence standard applies and we noted that it's actually the arbitrary and capricious standard. It doesn't really matter. That was just a technical notification for the court's benefit. But even under the substantial evidence standard, under the ERSAC case, the board's decision has to be upheld, and that's cited in our brief, unless the evidence compels the opposite conclusion. And that's clearly not the case here. It doesn't compel the conclusion that subsistence hunting was as successful or that there were no safety concerns. It's entirely consistent with the board's decision. So under, I think the deferential standard of review certainly comes into play. And under that standard, the board's factual determinations would have to be upheld on the merits. Do you think the district judge needs to take the first shot at this? Should we remand it? Well, as a technical matter, the judgment on appeal dismisses the K-Cunt as moved, the K-Cunt claims as moved. That's the only judgment on appeal. So if the court were to go beyond that judgment and adjudicate and rule on the merits and rule in our favor, you know, technically it would not be affirming the district court's judgment anymore. It would be going beyond that. So we think, as a technical matter, the best course is to send it back. Now, my opponent did cite Planned Parenthood, and that does suggest that the court would have discretion to rule on the merits. But to us, strictly speaking, it seems like the most prudent course would be to send it back, but it's moved. So that wouldn't make any sense. And briefly, as to the, revisiting briefly, mootness on the Unit 13 issue, there was an argument made that we shouldn't look to Village of New Iqsut or Ramsey because those only involve procedural challenges. There's, I didn't really hear an explanation of why that mattered all that much, but it's also incorrect with respect to Ramsey. That was a substantive, arbitrary, and capricious challenge to a biological opinion. It wasn't a procedural challenge. And interestingly there, the court said that even though the agency was going to rely on the same biological opinion to approve a future action, the controversy was still moot because the agency was going to use a different method to calculate one aspect of the analysis. So, you know, and here, we're going to, we would have a completely different analysis in support of any hypothetical future closure. So there's the, under this court's case law, the capable of repetition exception certainly doesn't apply to the Unit 13 hunt, Unit 13 closure, excuse me. Can I ask a quick question? If it turns out the FSB doesn't have authority to open hunts, would the state of Alaska then have the authority to open hunts on the federal public lands? Well, the state of Alaska has general authority to regulate hunting on federal land except to the extent it's displaced by federal regulations. But if what your honor is asking is would the state have authority to implement the federal subsistence priority and implement the rural subsistence program, the answer is no unless and until Alaska submits a compliant program to the board and the secretaries of interior and agriculture and they certify that the program is compliant. Unless and until that happens, it's the federal government's responsibility to run that program on federal land and that issue was decided conclusively 25 years ago. There was a mention of permanent closure as a possible long-term solution in the transcript of the FSB board hearing in July 16 of 2020. What would be the authority to do that? It says that was a proponent, so it wasn't necessarily, I don't think it was necessarily the FSB's position, but what would be the authority? Is that even something that the FSB would contemplate? Well, it couldn't happen under the temporary regulation 100.19 because that doesn't allow for permanent actions. But I'm not aware of any reason in the statute why the board couldn't impose a permanent closure under section 31253 and 3126 and then in its general, that would be the statutory authority, and then its general regulations would be the regulatory authority to do that in its biennial two-year cycle. So that's the thing. I mean, the temporary special action regulation here, it doesn't expand the board's substantive authority under the regulations. It only allows the board to exercise that authority on an emergency sort of abbreviated basis in response to exigent circumstances. So all of the authority in that reg is also authority that the board has under its substantive regs. And so in response to your question, they would just implement permanent closure under their general regulations. All right. Thank you very much. Good morning, Ms. Leonard. May it please the court. Whitney Leonard for the Organized Village of Cake. And I'll be speaking just with respect to the cake community hunt. So I want to start by providing a little context for that hunt. Cake is a Tlingit Alaska native village of about 600 people. It's extremely isolated, accessible only by boat or small plane. It has one small food store. It's always been highly reliant on a subsistence way of life. It represents the far reaches of the supply chain in the best of times. And in April 2020, when the Cake Tribe requested this emergency hunt, the pandemic, of course, was in full swing. The village was on lockdown, supply disruptions, we're leaving empty shelves at the store. So aren't you telling us that this is capable of repeating itself because they are so isolated? I think Cake, as an isolated community, continues to be vulnerable to supply disruptions. But again, I think if that situation were to recur and Cake were to request another hunt, that would have to be analyzed under the circumstances there. But you're only going to ask for 60 days and then it's going to be done. Right. I think one important point on the mootness issue is, you know, the state has focused on this idea that the issue would evade review. But here they didn't even make an attempt to seek timely review. We had a 30-day hunt. It was authorized for a potential extension to 60 days, but the hunt in the end was only 30 days. That's clear in the record. The hunt was over by the time the state filed its action on August 10th. The state, after the preliminary injunction was denied, didn't make an attempt to seek review of that, made no attempt to expedite any of the proceedings. So this is a particularly poor case for application of the exception to mootness because of those facts that the state, you know, if it wants to try to seek review in a more timely way in the future, of course, it's welcome to do that. But it simply didn't do that here. Don't you think the testimony from the residents of Cake is enough to get past arbitrary and capricious? Certainly. And I think there's ample evidence in the record, as your honor pointed out, and the state on appeal hasn't challenged whether the merits of the board's decision were correct. It's raising only this legal issue as to the board's authority. And as to that issue, the action taken by the federal subsistence board here to allow the community to take a small number of moose and deer on federal lands was squarely within the board's power. So if I may, leaving mootness aside for a moment, I'll issue. The first is that Congress looked at and ratified the secretary's interpretation of their authority through the 1997 and 1998 amendments to ANILCA. And second, contrary to the state's reply brief, the state's position here is barred by res judicata given the state's stipulation in Katie John 1. So as to the first point, in the 1997 amendments, Congress specifically said that, in accordance with Title VIII, the secretary is required to manage fish and wildlife for subsistence uses on all public lands in Alaska because of the failure of state law to provide a rural preference. That statement in itself ratifies the secretary's interpretation that they have authority to manage subsistence hunting on federal land if the state can't provide the rural preference. Moreover, in those amendments, Congress was perfectly clear that unless the state enacted its own rural preference, the federal regulatory scheme would remain in place. And of course, that's exactly what happened. So that shows that Congress agreed with the secretary's interpretation and ratified it by choosing to leave it in place. And second, the state is barred here from relitigating an issue that was already litigated and lost in the first Katie John case, as my colleague briefly mentioned. In that case, the state brought a claim arguing that, quote, that Title VIII does not vest the secretary with authority to assume day-to-day management of fish and game for subsistence purposes on public lands. That's a quote from the district court's decision describing the state's claim. That's the exact same argument that the state is making here. And so when we're talking about the same claim and the same parties, that's an issue of race judicata. The state frames it as an issue of estoppel. And even in the estoppel cases that the state cites, those cases involve non-mutual estoppel. And they acknowledge that where you have the same parties, estoppel or race judicata can run against a government. So that issue really has already been decided under that rule. The question of whether the secretaries can manage and set seasons has already been resolved. And numerous decisions from this court have, you know, in looking at various provisions of ANILCA, have expressed the same understanding of the basic statutory scheme, that the secretaries have the authority and indeed the duty to manage subsistence hunting on federal lands unless the state enacts laws enabling it to step in and provide the subsistence priority. It's described that way in the Ninilchik decision from this court, the Quinnahock decision, the Kenaitze decision, as well as also the McDowell decision from the Alaska Supreme Court. I see my time has expired, so with that, I'd urge the court to... Can I ask one quick last question, Judge Nguyen? Sure, of course. Can you provide any guidance on, for the exception to mootness, how similar do the actions need to be? How similar do the records need to be as well? I think, I'm not sure I have much more guidance than what's already been discussed. I think the case law makes clear that, particularly here where the state has acknowledged it's bringing an as-applied challenge, you know, key to the as-applied challenge is to look at how the application of the regulation would need to be looked at under the facts of the situation in that case. I know that doesn't provide a lot more guidance, as Your Honor mentioned. The cases don't tell us exactly where to draw the line, but I think it's clear that it's not here. Thank you, counsel. Thank you. Let's put three minutes on the clock. So, first, just in emergency situations, the state absolutely does work. Just a little background information, with rural communities, to open hunting seasons, the state has concurrent authority at the very least, and actually primary authority. So, recently, there was a typhoon in western Alaska, and some villages lost their winter stores, and the state said, okay, we're going to open up hunting opportunities. The state does this. The state's not challenging, like, the merits of the cake decision, but the state does do this when it does think it is merited. We're just arguing, you know, a legal issue. Regarding mootness, I know— Well, counsel's saying that the legal issue could be brought in a different case right now, given that this cake is over. It's not evading review when you can easily bring another challenge. Well, we can never bring a challenge to a special action regulation, and there are particular procedural harms and protections that we have during the regular process that we just don't in special actions. They occur too quickly for us to get—I mean, there wasn't timely notification here. There was some notification of the state, but by the time the state was able to get to the hearing, it just didn't have enough information to bring to the table to say, this is why—this is, like, a bad idea. I think the record is wrong on that point. The local park manager actually contacted the state, and for about 10 days, the state didn't respond. And so then that's why the local park manager then sent it to the FSB. So I just think factually to say that there wasn't an effort to try to consult the state with regard to the cake hunt is not— So I think there wasn't a timely effort. I'm not sure how many days. There's a regulation on how many days. I think it didn't meet those days, but regardless, there was an— But you would agree the state did not respond to the local park manager's request for the state's input. I don't think the state had enough time to respond, but the state did come to the hearing. Okay, but they did not respond to the local park manager's request for input. I know that there's an email saying, hey, we didn't get a—this—we kind of got blindsided by this, and we just learned about it in an email, and then the state came to the hearing. I think that's what the record said. It's not that the board did not notify the state at all. It just had that much time, and it really didn't give them much time in this particular situation. Judge Koh, I know just for Unit 13, you seem—and maybe other judges, too—you seem to think that that is—it does not—the exception does not apply. If that's true, we do think the appropriate remedy is vocateur of that part of the decision, and I think this is a little bit of an unusual case where we would be asking for part of the decision—to vacate part of the decision. I asked this court to look at City and County of San Francisco v. Garland, which is a really recent case, 42nd F-4th 1078 at Pennsite 1088— 42nd F-4th—F-4th 1078 at Pennsite 1088 for just vacating part of a decision when it becomes precedent for that. It just doesn't—it happens very infrequently, so there's, I think, not a ton of it out there. And— Do you have an argument to respond to the race judicata argument that Ms. Leonard just raised? Sure. So, I actually think that the district court actually even responded to this in a footnote in—I can't remember if it was the preliminary injunction order or the final order, and I apologize about that. I think it was the P.I. order, which is in Cake's excerpt of the record, and that is that, no, this issue has never actually been decided. It wasn't decided in Quinn Hook. It wasn't decided, and that's whether the board has the authority to open hunts. No, this issue has never been addressed. We don't take any issue with the fact that Congress delegated some authority to the federal subsistence board. We take issue with what authority that was and whether they granted the authority to open hunting seasons. We think that the statute very clearly says in both, you know, 3114, which is the preference, and also in the policy that the preference occurs when it is necessary to restrict. It's all about restrictions. If you look at 3115C, it talks about the secretary's closure authority. It's all about restrictions and closure authority. It's not about completely supplanting the state's management on federal public lands and, you know, disrupting the state's unless my colleagues have any additional questions. Judge Boo, Judge Ko, do you have any additional questions? Thank you. All right. Thank you very much to all counsel for your helpful arguments in this very interesting case. The matter is submitted, and that concludes our argument week. Court is adjourned.
judges: NGUYEN, KOH, Bough